Breitel, J. (dissenting).
This case involves a dispute over the amount of commissions earned by a local exclusive sales representative in the sale of acoustical building windows for a California manufacturer, Sitelines. A written agreement for *235 commissions containing concededly an ambiguous term is involved. The issue is whether the commission rate allotted to ‘ ‘ a specification ’ ’ in the agreement required as a precondition that plaintiffs procure in building plans the specification of Site-lines ’ standard product. Defendant Sitelines argues yes, and plaintiffs have argued to the contrary. If Sitelines be correct, plaintiffs are entitled only to a 5% rather than a 10% commission, roughly a difference between $28,791 and $57,582. The 5% commission compensates plaintiffs for placing the order, and also for performing field services during installation on which there is no disagreement within this court.
A parallel question is whether during the negotiations for the contract on which the commissions are claimed the parties understood that the right to the additional rate of commissions remained disputed or instead reached some accommodation by words or conduct. On this question there is no dispute; the parties testified that at all times they were in contention as to the rate of commissions.
The extensive but unsuccessful efforts of plaintiffs to get Site-lines’ standard product specified, defendant’s proof, and the only expert testimony amply support the trial court’s finding that ‘ ‘ a specification ’ ’ referred to Sitelines ’ standard product. It is undisputed that plaintiffs never procured the specification of Sitelines’ standard product in the construction project in connection with which the commissions are claimed.
The written agreement between plaintiffs and Sitelines provided as follows with respect to commissions: ‘ ‘ Commissions will be paid on the basis of 10% base commission, distributed one-half for a specification and one-quarter each for the order and field service. In the event of a project involving more than one territory or representative, commissions will be split and Sitelines will be the sole arbiter as to the amount and distribution of split commissions.”
Prior to the sale which gave rise to the present dispute over commissions, plaintiffs had made on behalf of defendant sales of Sitelines’ windows totaling about $3,000. Pull commissions were paid because plaintiffs procured the order, the specification, and provided field service. The product was new and Site-lines was struggling to have it accepted in the market. Plaintiffs made contact with an architect who was designing the world *236 headquarters of a major corporation, Pepsico. After extensive negotiations plaintiffs persuaded the architect to consider use of a Sitelines product. However, the architect did not accept the standard Sitelines window. Instead, he required changes in size and in the metal trim which made it impossible to use the standard tools and dies. But Sitelines was anxious to make the sale. It was willing to go to considerable expense to modify its design, even to take a loss if necessary, in order to obtain the bid. Sitelines was successful, ultimately deriving $590,824 in gross revenue from this project.[1] Its net return was another matter.
The testimony is clear. Plaintiffs testified unequivocally that throughout the transaction they claimed a right to a full 10% commission. Defendant’s president testified with equal firmness that at all times he disputed this right because of the failure to obtain a specification of its standard product, but stated candidly that he nevertheless hoped to pay plaintiffs a full 10% commission if the project were profitable enough. In that vein, and this is not contradicted, he always insisted to plaintiffs that they were not entitled to that commission as of right because the standard Sitelines product had not been specified or used. Letters exchanged between the parties demonstrate conclusively that both parties told the truth about their own and the others’ respective positions. Defendant’s president also stated that it computed in its bid a full 10% commission because that is what it hoped to pay, and said it would pay, if all went well. Nevertheless, defendant would not be so bound until the financial impact was resolved and the parties reached agreement on what commissions should be paid on this project merely for placing the order.
On the trial defendant’s president and an industry expert testified that a full commission would not be earned or paid unless the salesman had procured specification in the plans for the construction project of the manufacturer’s product. This meant precise specification by brand name or equally identifying description. Field service in connection with installation was also a precondition.
*237 The trial court, crediting the evidence as to the meaning of “specification” proffered by defendant, held that the additional 5% commission had not been earned. On the other hand, it found in favor of plaintiffs with respect to field service, holding that the additional 2%% commission had been earned, together with 2%% for the placing of the order. Plaintiffs, therefore, recovered a judgment of $28,791, the payment of which is no longer disputed, most of which has been paid, and the balance is more than covered by moneys now in escrow.
The Appellate Division modified, awarding an additional 5% commission on the theory that the reference to “ a specification ” only fixed the time payment was to be made. This theory is not supported by the record. Moreover, there is another provision in the agreement determining the time of payment which reads as follows: “ Commissions will be paid when payment on an order has been received by Sitelines. Commissions will be paid monthly.” Rules of construction of contracts require an interpretation which gives meaning to every provision of the agreement (Restatement, Contracts, § 235, subd. [c]; Restatement, 2d, Contracts [Tentative Draft No. 5, March 31, 1970], § 228, subd. [2], Comment d; Rentways, Inc. v. O’Neill Milk & Cream Co., 308 N. Y. 342, 347). To find that reference to a specification fixes the time of payment creates an inconsistency as to when payment should be made. Moreover, it leaves the agreement without a provision specifying the categories of services the plaintiffs had to perform in order to earn their commission. The plain meaning of the language of the agreement, the testimony of the parties, and the testimony of an outside expert, all support the conclusion that the 5% commission was not earned unless the plaintiffs obtained “ a specification ”.
Thus far the result in the trial court and the unsupportable modification in the Appellate Division have been treated. Because of the modification in the Appellate Division, this court in review may choose either of the versions of fact thus far found, but no other. Thus the Appellate Division result may not be preserved by still another theory of law or fact unsupported by findings of fact in either court below (Cohen and Karger, Powers of the New York Court of Appeals, § 113, p. 488).
*238 It has been suggested that whatever the contract meant in the case of ordinary sales, its meaning had been changed in the excitement of negotiating this particular highly-desirable, and for the parties, vast project. This theory involves new findings of fact not passed upon by any court below and not supported by the evidence. True, Sitelines’ president candidly admitted that Sitelines hoped to pay the full 10% commission if the project worked out successfully. However, he also expressed an intention that the parties remain bound by their agreement until they should agree upon an upward modification in the light of the financial impact of the large order even if for a nonstandard product.[2]
Epitomizing the positions of the parties during the negotiations is the following paragraph from a letter memorandum sent by plaintiff Adams to defendant Sitelines: “As regards your last paragraph, I am like a peace talk negotiator, who has to go on record every time that you go on record and play the old refrain that ‘ We expect to be paid our full commission of 10%, and while we will discuss your financial problems with you, we must state that this discussion is without prejudice to our fixed position ’ or some such legal garbage. In any event, both Carl and I appreciate that you are leaning over backwards to help us, and we particularly appreciate the timing of your help. Thanks again to you and Dick from both of us.”
Thus, what remains is the problem with which the trial court began—the problem of determining whether the plaintiffs had obtained ‘ ‘ a specification ’ ’ within the meaning of the commission agreement. The Trial Judge’s determination that this provision referred to specifications of the manufacturer’s standard product is supported, if not indeed compelled, by the evidence. The plaintiffs concede that they tried in extensive negotiations to persuade the architect to use the manufacturer’s specification, but failed. As a result, the manufacturer incurred additional costs in excess of $50,000 to make its product conform to the architect’s requirement. An expert, qualified in the practice of the industry, testified, as noted earlier, for the defendant that under this contract “ a specification ’ ’ required conformity to *239 the manufacturer’s standard product. There was no expert testimony on behalf of the plaintiffs. With the evidence showing that the plaintiffs understood that it was important to have the standard product specified, that the manufacturer had good reason to pay an additional fee for this specification, and the expert testimony, the Trial Judge’s factual determination that specification of the manufacturer’s standard product was required is supported by the weight of the evidence.
It should be obvious that this court is limited largely to a question of interpretation of the agreement. Whether plaintiffs performed “ a sufficient role ”, as the majority writes, “ to meet any reasonable requirement as to earned commissions usual for a manufacturer’s representative ”, is an inappropriate inquiry. Plaintiffs are limited to recovery on the contract and their theory of liability. They are not entitled to an arbitrated, and what some might regard as an equitable, settlement. Moreover, even assuming the appropriateness of such analysis, no evidence is present, if indeed it would have been admissible, to establish that 10% is a “ usual commission ”. Worse, to bypass the written agreement and treat the case as arising in quantum meruit is unfair to defendant who has had neither opportunity nor reason to offer proof on that issue.
And, of course, waiver or modification of the terms of the agreement by any practical construction or otherwise are precluded by the record. Least of all is it a court’s province to assess whether defendant, despite the terms of the commission agreement, should be especially grateful for obtaining this large order through plaintiffs’ efforts. That defendant should accept manfully the unprofitableness of the order is not relevant; it had feared and guarded against precisely such unprofitableness if the specification were not obtained. As it is, plaintiffs under the trial judgment would receive'$28,791 for what was less than a full contribution to the result.
Accordingly, I dissent and vote to reverse the order of the Appellate Division and reinstate the judgment of the trial court, on the ground that the factual determinations of the Trial Judge are supported by the evidence, and no acceptable alternative findings were made by the Appellate Division or are available to this court.
*240 Chief Judge Full and Judges Burke, Scileppi and Gibson concur with Judge Bergan; Judge Breitel dissents and votes to reverse in a separate opinion in which Judge Jasen concurs.
Order affirmed.
(Appendix)
June 29, 1968
Carl A. Sehroeder & Co.
P.O. Box 12
Flushing, N. Y.
Attention : Carl & John
Subject: Pepsieo Commission
Dear Carl & John:
I can’t tell you how many times Dick and I have discussed your commission on this job so that we might determine an amount which you could look forward to. As you know only so well, there have been so many variables effecting our cost that we have been unable to accurately forecast our profit.
I don’t think it necessary to restate all the events which, over the course of bidding and getting this job, have increased our cost substantially. John, we discussed this problem briefly during my last trip to New York. The purpose of this letter is merely to let you know that we are not ignoring the issue. If you have no objections, we would prefer to delay a final decision on this matter until such time as we can all sit down and personally discuss it fully.
You know that we are very appreciative of your efforts in helping us with this job. Let me assure you that we will compensate you fully.
Sincerely yours,
SITELINES INC.
Larry
LWC:dam
August 31, 1968
Sitelines, Inc.
14705 Keswick Street
Van Nuys, California 91405
Attention Larry and Dick
Subject: Pepsieo Commissions
Dear Larry and Dick:
The fact that we haven’t answered your letter of June 29, 1968 on the subject of Pepsieo commissions doesn’t mean that we haven’t looked at this matter in every possible light.
*241 I’m sure that you realize that we have been doing things for Sitelines and the Pepsico job (if they can possibly be separated) that no manufacturer’s rep would (or in many cases could) do for his principal. I’m of course referring to such things as bonding, legal conferences, sub-contracting, supply sourcing, etc., and since to a rep, time is money, we have and still are spending a lot of money on this phase of the job.
As you point out, it’s a difficult subject and one which can be argued convincingly on either side. Putting aside our rep’s agreement for a minute, we expect to be reimbursed for our achievement in opening the great big New York door, as well as for our special work which became essential under the conditions surrounding this job.
How it all adds up and how your extra costs may possibly subtract something is a tough problem. We, too, would like to see both sides agree so that we can plan ahead financially.
Very truly yours,
John P. Adams
ce Mr. Larry Connelly, Hotel Belmont Plaza, NYC

. That the parties understood the situation equally well is demonstrated by an exchange of letters appended in full after this opinion.